**BENSON, Appellee,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Appellant.**

[Cite as *Benson v. Unemp. Comp. Bd. of Review* (1995), 101 Ohio App.3d 32.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 16478.

Decided Feb. 8, 1995.

*Steven B. Chesler,* for appellee.

*Betty D. Montgomery,* Attorney General, and *James A. Barnes,* Assistant Attorney General, for appellant.

_____

DICKINSON, Judge.

The Ohio Unemployment Compensation Board of Review ("board") has appealed from a decision of the Summit County Court of Common Pleas in which Leslie B. Benson was found to be entitled to unemployment compensation benefits. The board has argued that the court of common pleas incorrectly reversed the board's decision to deny benefits to Benson. This court reverses the judgment of the court of common pleas because it abused its discretion by holding that Benson was entitled to benefits.

I

A

Benson formerly served as sales manager for a new and used truck dealership in Richfield, Ohio. He was discharged from that position on April 9, 1992. On April 16, 1992, he applied for unemployment compensation benefits. The Administrator denied his application and reaffirmed that denial following a request for reconsideration. Benson appealed to the board, and a hearing was held before a referee. The referee affirmed the decision of the Administrator, and Benson applied for further appeal. On January 5, 1993, the board disallowed Benson's application for further appeal. Benson timely appealed that decision to the Summit County Court of Common Pleas. On August 31, 1993, the court of common pleas entered judgment reversing the denial of Benson's claim and holding that he was entitled to benefits. The board timely appealed to this court.

B

Benson was hired by the truck dealership on December 9, 1990. According to Mr. Benson, an important factor in his decision to leave his previous employment to accept the position with the truck dealership was the fact that Ken Soltesz,

who had previously served as the controller of the dealership's parent company, was in the process of buying the dealership and had just become its president. As president, he was Benson's immediate superior.

In an evaluation conducted on June 26, 1991, Benson's performance was generally rated as "good" and, during January 1992, he received an $8,000 raise in his annual base salary. By April 1992, however, the transaction by which Soltesz was buying the dealership had fallen through. Soltesz was returned to his previous position and, on April 6, 1992, Arthur Gibbs was hired to serve as general manager of the dealership. As general manager, Gibbs was Benson's immediate supervisor. Benson and Gibbs did not get along as well as Benson and Soltesz apparently had. Conflict immediately arose between them, and, four days after Gibbs began his employment, he fired Benson.

In testifying before the referee, Gibbs explained that his first problem with Benson occurred on his first day on the job. He told Benson that, "as a matter of policy[,] I did not want to finance any used truck buyers in the case where our company would have 100 percent recourse in the event of a repossession." According to Gibbs, Benson responded by saying that he (Mr. Benson) "may as well leave the job right now."

Later that same day, Gibbs told Benson that the dealership's used trucks should be merchandized differently depending upon whether they were going to be sold wholesale or retail. Trucks that were going to be sold retail should be made "front row ready, meaning detailed, cleaned, painted, and mechanically inspected as necessary." According to Gibbs, Benson "responded negatively," saying that he never knew whether a particular truck would be sold wholesale or retail.

Gibbs testified that, on his second day of employment, Benson "challenged my business judgment and authority in front of the sales staff and in front of the man whose position I was taking." According to Gibbs, at a sales meeting, Benson told him he was wrong to "only process credit applications if the salesman had a customer deposit and a signed buyer's order." For the remainder of the sales meeting, Benson was totally inattentive, appearing to be napping. Later that day, Benson asked Gibbs whether he would be interested in taking over the lease on his apartment, apparently implying that he knew he would soon be discharged and would no longer be living in the area.

Gibbs testified that, on the third day of his employment, he, Benson, and Soltesz flew together to Washington, D.C. to attend a seminar. He stated that he overheard Benson tell Soltesz a story on the plane about someone who had sold trucks to a company owned by "Jews from New York." Gibbs, who was both Jewish and from New York, was offended. He further testified that Benson avoided him and Soltesz during the seminar.

Gibbs testified that, on the fourth day of his employment, he overheard part of a loud argument between Benson and Soltesz. Soltesz informed Gibbs that Benson had been questioning Gibbs's "professional background." Later that day, Gibbs fired Benson. Upon being fired, Benson called Gibbs a number of names and accused him of being afraid that Benson would reveal things that he had learned about Gibbs's prior employment. The following day, Gibbs prepared a written statement in which he listed five reasons that he had fired Benson:

"Number one—Not a team player.

"Number two—He vociferously resisted taking direction from management.

"Number three—He resisted and rejected new policies and procedures being installed by the new general manager.

"Number four—He had an uncompliant personality. And

"Number five—He was disruptive relative to the morale of the Sales Department."

In his testimony before the referee, Benson acknowledged that most of the incidents described by Gibbs had occurred. He did, however, cast those incidents in a slightly different light. He maintained that much of the friction between the two men was caused by Gibbs attempting to give directions before he was oriented to his new position:

"Well he uh, initially was supposed to observe for 30 days, and [Mr. Soltesz] brought him around to introduce him to everyone, and he immediately began giving critique and direction and just, as if he'd been there for a long time, and I immediately made the comment, and politely so, this is as one professional to another, 'Why don't you just kind of learn your way around and the phone system and we'll talk later about where I've been for the last 17 months?' And then later on that day he interrupted conversations with my salesmen and myself and other department managers, making decisions when he didn't even know which hallway to turn down yet, so yes, sir, there was friction from day one."

According to Benson, his disagreement with Gibbs in front of the sales staff regarding the processing of credit applications had occurred at a type of meeting in which free exchanges of ideas had traditionally occurred:

"I objected. I don't feel it was a challenge. Umm, he made the statement and I said 'Wrong,' and I said, you know, no, but I expressed my opinion. This meeting is an open air meeting. We have an open-door policy, and you know, there, it's not a meeting to chew out or to praise. It's a meeting to grow, to, to discover what we're doing well and wrong and to bring it up, and I said I did challenge it, as I did, as he has told the truth. I did challenge him on several points."

When asked if his challenges had irritated Gibbs, Benson replied: "Uh, he didn't explain at that time."

Benson stated that he did not recall telling Soltesz a story involving "Jews from New York." He acknowledged, however, that he was familiar with the story to which Gibbs referred and that he did not know if he had "made a reference" to it and that, "to be fair, maybe I did and maybe I didn't." He claimed, however, that, at the time he allegedly told the story, he did not know that Gibbs was Jewish. He denied that he purposely avoided Gibbs and Soltesz at the seminar.

## C

As stated previously, the referee before whom Benson and Gibbs testified affirmed the decision of the Administrator to deny Benson unemployment benefits. In doing so, he found that Benson had been discharged for just cause:

"The claimant had performed his duties as truck sales manager to the satisfaction of the employer for over a year and he resented taking directions and instructions from a new supervisor. It is considered the duty of an employee to accept and carry out directions and instructions from supervision. As a result of the claimant's failure to comply with directions and instructions from his supervisor, his further employment was not in the best interest of his employer."

In reversing the decision of the Administrator, the court of common pleas stated that the referee's finding was not supported by the record:

"The Referee found [Benson] was terminated with just [cause] 'because of his failure to follow the directions and instructions from the general manager in the performance of his assigned work.' A review of the record does not support this conclusion. [Benson's] actions did not demonstrate an unreasonable disregard for his employer's interest. Nor does the record indicate [Benson] failed to follow any specific directions or instructions from the general manager."

## II

■ The board's sole assignment of error is that the court of common pleas incorrectly reversed the board's decision to deny benefits to Benson. The standard to be applied by a common pleas court in an appeal from a decision of the board and the manners in which it may dispose of such an appeal are set forth in R.C. 4141.28(O)(1):

"If the court finds that the decision was unlawful, unreasonable, or against the manifest weight of the evidence, it shall reverse and vacate such decision or it may modify such decision and enter final judgment in accordance with such modification; otherwise such court shall affirm such decision."

An appellate court's review of a common pleas court's disposition of an appeal from the board is more limited. An appellate court may only reverse a decision of a common pleas court in such a case if the common pleas court abused its discretion. *Angelkovski v. Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 161, 11 OBR 242, 243–244, 463 N.E.2d 1280, 1282–1283.

R.C. 4141.29(D) provides, in part, that an individual may not receive unemployment compensation benefits if he has been discharged from a position for "just cause":

"(D) * * * [N]o individual may serve a waiting period or be paid benefits under the following conditions:

" * * *

"(2) For the duration of his unemployment if the administrator finds that:

" * * *

"(a) He * * * has been discharged for just cause in connection with his work * * *."

In this case, the referee concluded that Benson had been discharged for just cause. The court of common pleas determined that the record before the referee did not support that conclusion. This court, however, cannot agree with the assessment of the record by the court of common pleas.

■■■ A determination of the existence of just cause must be made on a case by case basis:

"The term 'just cause' has not been clearly defined in our case law. We are in agreement with one of our appellate courts that '[t]here is, of course, not a slide-rule definition of just cause. Essentially, each case must be considered upon its particular merits. Traditionally, just cause, in the statutory sense, is that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.'" *Irvine v. Unemp. Comp. Bd. of Review* (1985), 19 Ohio St.3d 15, 17, 19 OBR 12, 14, 482 N.E.2d 587, 589, quoting *Peyton v. Sun T.V.* (1975), 44 Ohio App.2d 10, 12, 73 O.O.2d 8, 9, 335 N.E.2d 751, 752.

That determination is primarily to be made by the trier of fact:

"The determination of whether just cause exists necessarily depends upon the unique factual considerations of the particular case. Determination of purely factual questions is primarily within the province of the referee and the board." *Id.*

Contrary to the apparent belief of the court of common pleas, a refusal to follow a direct instruction of a supervisor is not always a prerequisite to a finding of just cause.

In this case, the referee, as trier of fact, determined that Benson had been discharged for just cause. There was evidence in the record that Benson had criticized Gibbs in front of other employees, had expressed the idea that he would soon be discharged as a fait accompli, and had taken actions that were apparently aimed at having his employer reconsider its decision to hire Gibbs. The determination by the board that Benson's employer had just cause to discharge him based upon that evidence was not "unlawful, unreasonable, or against the manifest weight of the evidence." The court of common pleas abused its discretion by substituting its judgment in place of the judgment of the board. Accordingly, the board's assignment of error is sustained.

## III

The board's assignment of error is sustained. The judgment of the Summit County Court of Common Pleas is reversed, and the decision of the board denying benefits to Benson is reinstated.

*Judgment reversed.*

REECE, P.J., and QUILLIN, J., concur.